IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 7, 2017

**STATE OF TENNESSEE v. JULIAN AGNEW**

**Appeal from the Criminal Court for Shelby County**
No. 13-04046          **Chris Craft, Judge**

_____

**No. W2016-00908-CCA-R3-CD**

_____

Julian Agnew ("the Defendant") was convicted by a Shelby County jury of one count of aggravated robbery. The trial court sentenced the Defendant to ten years and six months in the Department of Correction with release eligibility after service of eighty-five percent of the sentence. On appeal, the Defendant argues that the trial court abused its discretion by allowing prosecutorial misconduct in closing arguments and that the evidence at trial was insufficient for a rational juror to have found him guilty of aggravated robbery beyond a reasonable doubt. After a thorough review of the record and case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Stephen Bush, District Public Defender, and Phyllis Aluko, Assistant District Public Defender, Memphis, Tennessee, for the appellant, Julian Agnew.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lora Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Factual and Procedural Background**

*Jury Trial*

Ashley Patterson testified that on April 11, 2013, she was working at the Check Into Cash store on Getwell Road around 10:00 a.m. Ms. Patterson stated that she had

gone to a bank to withdraw $3,000 for the business' daily expenses and transactions. When she returned to the store from the bank, she "stepped out of [her] truck and locked [her] truck, walked to the back of [her] truck and [a man] popped out from the truck that was beside [her] and pointed the box [cutter] blade in [her] face and said [']give me the money.[']" Ms. Patterson described the man as wearing a black hoodie and being slightly taller than her height of 5 foot 2 inches. When Ms. Patterson refused to give the man the money, they began "tussling." The man "grabbed [her] purse and it got wrapped around [her] arm. And then he pushed [her] to the ground and stuck his hand in [her] purse, grabbed the money out and took off." Ms. Patterson stated that she was cut on her finger and on her head during the robbery. She testified that the weather that day was "cloudy and rainy" but that it was light outside. She stated that he was approximately one arm's length away and that she could see the man's face as he approached her. At trial, Ms. Patterson identified the Defendant as the man who committed the robbery.

After the Defendant and Ms. Patterson "tussled" over her purse, the Defendant "took off." Ms. Patterson saw the Defendant run between the buildings but then lost sight of him. Ms. Patterson was taken to a local hospital for treatment, and she later gave a statement to police. She also viewed a photographic lineup while at the police station. Ms. Patterson testified that she read and signed a statement called "advice to witness viewing photographic display" before viewing the lineup. She stated that, on the lineup, she "circled [the Defendant's] picture, put the date, put what happened and signed [her] name." Ms. Patterson explained that she was asked to identify the Defendant from a group of five or six men during the preliminary hearing. Ms. Patterson stated that she could not identify the Defendant during the preliminary hearing because the Defendant "had on glasses and shaved off his goatee," and she did not recognize him. She stated that, as soon as she sat down, she realized she had made a mistake. Ms. Patterson stated that she was sure the Defendant was the individual who robbed her and the individual whom she picked out in the photographic lineup.

On cross-examination, Ms. Patterson testified that the Defendant held a box cutter in his right hand while he robbed her. She admitted that, after the offense, she told the police that the Defendant could have had a knife, but she stated that she believed it was a box cutter because the cuts she sustained were so shallow. Ms. Patterson stated that the Defendant held the weapon near her face, but she explained that the Defendant had a jacket on and that "the jacket was covering most of it but the blade." On redirect-examination, Ms. Patterson agreed that she never informed the police that the Defendant did not have a weapon. She agreed that she described the weapon as a box cutter, and she explained that she was cut by the blade during the struggle with the Defendant. Ms. Patterson explained that, after the altercation with the Defendant, she felt shocked and was "just really scared and didn't know what to do."

Officer Lernard Bowens testified that on April 11, 2013, he worked the day shift for the Memphis Police Department. He stated that, around 10:00 a.m., he arrived at the scene of the robbery on Getwell Road. He observed that Ms. Patterson was "nervous and scared[,]" that she "seemed disheveled[,]" that "[h]er clothes were all messed up[,]" and that "she had a cut on her hand and on her head." Officer Bowens stated that Ms. Patterson was bleeding "a little bit," so "[s]he was transported to Delta Medical in noncritical condition." Officer Bowens testified that Ms. Patterson informed him that a man "approached her from the street and she had her money in her purse [for] Check Into Cash." Ms. Patterson told Officer Bowens that the man "came up to her [and] was shaking her trying to get the purse from her[]" and that "she held onto the purse and that's when he start[ed] hitting her with his fist and cut her with a knife." Ms. Patterson also informed Officer Bowens that the man "went in her purse and got the money out and ran." Ms. Patterson informed Officer Bowens that $3,000 was stolen from her purse.

On cross-examination, Officer Bowens agreed that, in the incident report he prepared, he wrote that Ms. Patterson informed him that during the struggle her purse was wrapped around her arm and that the man was armed with a knife. He also agreed that, in the incident report, he wrote that Ms. Patterson informed him that the man was cutting her with his knife and hitting her head with his fist. On redirect-examination, Officer Bowens explained that the incident report was prepared at the scene of the offense based on the witness's statements. However, Officer Bowens agreed that Ms. Patterson did not initial or sign the incident report that he prepared and that it was not her official statement.

Angela Hunter testified that on April 11, 2013, around 10:00 a.m., she was driving "on Barron at the red light getting ready to make a right [turn] onto Getwell[.]" Ms. Hunter's daughter, C.M., was a passenger in the vehicle.[1] Ms. Hunter observed a man "standing out in the rain with a hood on his head." She stated that a truck "pulled in," and the man "ran over toward the truck." Ms. Hunter saw a woman, whom she later learned was Ms. Patterson, exit the truck, and the man "ran toward her [and] like threw her down on the ground." Ms. Hunter stated that, by the time the traffic light changed and she turned right onto Getwell, the man "was tussling with the young lady[]" and she believed the individuals were involved in a domestic dispute. Ms. Hunter explained that she was approximately a car's length away from the altercation between the two individuals. After turning onto Getwell, Ms. Hunter observed the man "dragging" Ms. Patterson, like he was "trying to get something from her." She stated that she did not see the man take anything from Ms. Patterson. Ms. Hunter described the man as wearing "a black jacket with a hood tied tightly around his face."

---

[1] It is unclear from the record whether Ms. Hunter's daughter was an adult so we will refer to her by her initials, which is the policy of this court.

Ms. Hunter stated that she then pulled into the parking lot of the Check Into Cash store and observed that the man was "struggling" with Ms. Patterson. She stated that she "pulled up" and told the man to leave Ms. Patterson alone. She observed that Ms. Patterson was "sitting down[,] bleeding and crying." Ms. Hunter stated that the man "managed to break away and took off running." Ms. Hunter followed him in the parking lot until he ran behind Walgreens. Ms. Hunter then pulled out of the parking lot and turned left onto Barron because she believed the man had run in that direction. She saw a white Nissan Maxima "sitting there with a young lady in it on the phone." Ms. Hunter stated that, by this time, she had called 9-1-1 and was speaking with the emergency dispatcher, who asked her for the make and model of the vehicle. Ms. Hunter stated that the vehicle "pulled off" but that the driver "kept hitting the brakes like she was looking for somebody." Ms. Hunter began to follow this vehicle until the emergency dispatcher told her to go back to the scene of the robbery. Ms. Hunter stated that, when she testified at the Defendant's preliminary hearing, she was unable to identify the Defendant as the man who committed the robbery. She also testified that, on the day of the robbery, the man was not wearing glasses and that she did not see him with a weapon.

C.M. testified that on April 11, 2013, around 10:00 a.m., she and her mother were driving down Getwell when she saw "a man beating up on a woman." As Ms. Hunter "pulled into the shopping center," C.M. saw that a man with a "black hood on" was "yanking at [] and hitting" a woman. C.M. believed she was witnessing a domestic violence incident. As Ms. Hunter drove closer, C.M. saw that the man "was . . . trying to get her bag . . . from her." She was close enough to the altercation to see "something in [the man's] hand that he was hitting her with that was causing her to bleed." C.M. was unsure what type of weapon the man was using, but she saw that "he had some type of weapon in his hand under his jacket sleeve." She observed that the woman "had gushing blood that was coming down the side of her face and . . . the back of her neck[.]" The man ran and she and Ms. Hunter "follow[ed] him through the shopping center and through a ditch down Goodman" until he came to "this house by a wooden fence[,]" at which point they noticed a white Maxima that had also been following the man. C.M. noticed the white Maxima because "it was driving really slow by the guy . . . that [they] were following." The female driver of the white Maxima was talking on her cell phone, and C.M. believed the female driver saw her and her mother because "she tried to . . . turn around and get away[.]" C.M. called 9-1-1 and told the dispatcher what they had observed. The 9-1-1 dispatcher then asked them to stop following the white Maxima and to return to the scene of the robbery. According to her April 11, 2013, statement to the police, C.M. indicated that she would not be able to identify the man who committed the robbery.

- 4 -

On cross-examination, C.M. testified that, during the robbery, she was approximately twelve to fifteen feet away from the man. She agreed that in her statement to the police she "said [Ms. Patterson] had a towel on the back of her neck and head and [that C.M.] saw the blood on the towel, but couldn't see where it was coming from." She explained that Ms. Patterson had "blood all over her hair" and that blood was "coming down in her face."

Tiera Cobb testified that she knew the Defendant because they used to date and that their sisters were friends. Ms. Cobb stated that she was dating the Defendant from 2012-2013 and that she worked at the Check Into Cash store on Getwell Road from January 2012 to August or September 2012. Ms. Cobb's duties at the Check Into Cash included "pick[ing] up money in the morning if [she] worked the morning shift" and that, when she went to the bank in the morning, she always picked up $3,000. After Ms. Cobb told the Defendant about going to the bank and picking up money for the Check Into Cash store, they decided that the Defendant would rob the employee picking up the money and that she would be the getaway driver. Ms. Cobb stated that the plan was for her to pick up the Defendant from his house on the morning of the robbery, drive to the Check Into Cash, drop off the Defendant, wait behind the store until the Defendant returned, and then leave.

Ms. Cobb stated that on April 11, 2013, the Defendant called her around 7:00 a.m. "to see [whether] everything [was] still going to go as planned." Ms. Cobb informed the Defendant that she was getting ready to leave and pick him up. Ms. Cobb testified that at the time of the robbery, she was driving an older model white Maxima with non-tinted windows. It was raining when she arrived at the Defendant's house between 7:30 and 8:30 a.m. Ms. Cobb picked up the Defendant, and they "went across the street from the location" and "waited in the parking lot of a barber shop[]" until a Check Into Cash employee returned from the bank. She stated that the Defendant was wearing blue jeans and "a black hoodie or a black zip[-]up jacket" with the hood up, a red shirt, and white shoes. Ms. Cobb knew that a Check Into Cash employee routinely picked up money from a bank every morning, but she did not know that Ms. Patterson was picking up the money that day. After Ms. Cobb observed Ms. Patterson leave the Check Into Cash store, she drove to the back of the Check Into Cash store and "parked at a house on the right[-]hand side [of the street]."

She stated that she waited for about ten minutes for the Defendant to return, but then she "got scared" and "started driving around." Ms. Cobb stated that she noticed that a vehicle was following her, so she called her cousin to ask for advice. She stated that she drove around the Check Into Cash store three times before she "kept straight on one of the streets" and again noticed that a vehicle was following her, and the occupants of that vehicle were "on the phone." Ms. Cobb guessed that the occupants of the other

vehicle were speaking "with the police giving them a description of [her] car." Ms. Cobb drove back onto Goodman, heard police sirens, and pulled into a driveway. She waited in the driveway for two or three minutes but left when she did not see the Defendant returning. As she was backing out of the driveway, two police patrol cars "cut [her] off" and told her to put her phone down.

Ms. Cobb testified that she gave a statement to the police later that day, but she did not "own up" to her involvement because she "was scared [and] trying to cover [her]self." She stated that, on the same day, she identified the Defendant in a photographic lineup and wrote on the lineup that she had dropped the Defendant off at Walgreens and that the Defendant had asked her to "pull up over the next street at his friend's house for him." Ms. Cobb stated that her written comment on the lineup was not truthful. She also testified that the Defendant did not wear glasses during their relationship, but she agreed that in her statement to the police, she stated that the Defendant did wear glasses. Ms. Cobb testified that she never discussed with the Defendant whether he would use a weapon in the robbery and that she did not see him with a weapon before the robbery occurred. She stated that she was arrested for her involvement in the offense and pled guilty.

Officer Jonathan Gross testified that approximately a month after the robbery of the Check Into Cash store, he was assigned to the Crump Station Task Force of the Memphis Police Department. Around 12:00 p.m. that day, Officer Gross "was traveling westbound on Chelsea Avenue and [he] was following a 2005 white Buick Rendezvous that had a taillight that was defective." Officer Gross conducted a traffic stop, and the female driver informed Officer Gross that her driver's license had been revoked. Officer Gross placed the driver into custody, but "[his] partner couldn't identify the passenger later identified as [the Defendant]." Officer Gross stated that the Defendant gave him a false Social Security number and the last name and birth date of a man named Octavious Kelly. Officer Gross looked up outstanding warrants for the area of the traffic stop and "located a picture of [the Defendant] and at that point [the Defendant] continued to say that he was Octavious Kelly." Officer Gross transported the Defendant to the police station and while Officer Gross fingerprinted the Defendant, the Defendant made a comment similar to "you got me." Officer Gross then learned the Defendant's name and date of birth and that "he had a warrant for his arrest for aggravated robbery." The Defendant was placed under arrest based on that warrant. Officer Gross identified the Defendant in open court as the passenger who told Officer Gross that his name was Octavious Kelly.

On cross-examination, Officer Gross stated that both he and his partner heard the Defendant say "you got me" while he was being fingerprinted. Officer Gross stated that he made a record of the Defendant's arrest under the outstanding aggravated robbery

warrant but agreed that he did not include the Defendant's statement in the narrative section of the arrest record. He also stated that he did not include the false Social Security number that the Defendant originally gave him in the arrest record.

After deliberations, the jury found the Defendant guilty of aggravated robbery. Following a sentencing hearing, the trial court sentenced the Defendant, as a Range I offender, to ten and one-half years in the Department of Correction with release eligibility after service of eighty-five percent of the sentence. The Defendant timely appealed the trial court's judgments.

## II. Analysis

### *Prosecutorial Misconduct*

The Defendant contends that the prosecutor "vouched for the credibility of two eyewitnesses, argued facts outside the record, argued a misleading fact, essentially commented on the [D]efendant's decision to not testify at trial[,] and asserted that the defense was engaged in an intentional strategy to confuse the jurors."

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). However, Tennessee courts have recognized that it is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). In *State v. Goltz*, this court stated that "expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt[]" and "making statements calculated to inflame the passions or prejudices of the jury[]" are possible areas of improper prosecutorial arguments. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

### **Harmless Error Analysis**

When an issue arises concerning improper prosecutorial argument, this court must first determine the type of error, if any, that was committed so that the correct legal standard for review can be applied and, if applicable, whether the error is harmless. As our supreme court has stated:

> All errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial. Accordingly, for the purpose of

the harmless error analysis, this Court has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories of error are more than academic because they define the standards that the appellate courts use to determine whether each category of error can be harmless.

*State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). Structural constitutional error requires automatic reversal. Non-structural constitutional error does not require automatic reversal but shifts the burden to the State to prove beyond a reasonable doubt that the error is harmless. Non-constitutional error places the burden on the Defendant to prove "that the error more probably than not affected the judgment or would result in prejudice to the judicial process." *Id.* at 372.

### *Comment on the Defendant's Right Not to Testify*

The Defendant contends that, during closing arguments, the State improperly commented on his exercise of his right to a jury trial and his right to not testify in the following statements:

> Ms. Cobb knew she made a mistake and she took responsibility. She told you how she pled guilty in this courtroom to her participation in the aggravated robbery. And I submit to you that she told you exactly the same thing that she told the Judge when she pled guilty to her involvement in that aggravated robbery. Once again, this lady had no record, never been arrested before. And she took responsibility for what she did even though she didn't get out [of] the car and cut Ms. Patterson.

> She didn't get out [of] the car and struggle with Ms. Patterson. She didn't take the $3,000 from Ms. Patterson's purse. She didn't push Ms. Patterson down. But she took responsibility for her part in that aggravated robbery and that's exactly what the Defendant should do[,] take responsibility.

The Defendant objected after the conclusion of this statement on the ground that the statement referred to the Defendant's right to not testify. The State argues that under the test set out by our supreme court in *State v. Jackson*, 444 S.W.3d 554, 587-88 (Tenn. 2014), "[n]either of the statements objected to in this case demonstrate a 'manifest intent' to comment on the [D]efendant's right not to testify or would necessarily have been taken

- 8 -

to be such a comment." The State further argues that the comment was harmless beyond a reasonable doubt because the comment was indirect and the evidence against the Defendant was overwhelming.

Both the United States Constitution and the Tennessee Constitution "guarantee criminal defendants the right to remain silent and the right not to testify at trial." *Jackson*, 444 S.W.3d 585. The Tennessee Supreme Court has previously cautioned that "[t]he subject of a defendant's right not to testify should be considered off limits to any conscientious prosecutor." *Id.* at 586 (quoting *State v. Hale*, 672 S.W.2d 201, 203 (Tenn. 1984)) (internal quotation marks omitted). In addition to direct comments on a defendant's decision not to testify, "indirect references on the failure to testify also can violate the Fifth Amendment privilege." *Id.* at 587 (quoting *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000)) (internal quotation marks omitted).

In *Jackson*, our supreme court overturned a second-degree murder conviction where the prosecutor, during closing rebuttal argument, "walked across the court room, stood in front of [the d]efendant, gestured toward her, and demanded in a loud voice, 'Just tell us where you were! That's all we are asking, Noura!'" *Id.* at 585. In its ruling, the court adopted a two-part test for determining whether a prosecutor's remark amounts to an improper comment on a defendant's constitutional right to remain silent and not testify. *Id.* at 587-88. The two-part test analyzes: "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." *Id.* at 588. This court reviews a defendant's claim of impermissible prosecutorial comment on the right not to testify de novo. *Id.*

Here, during the State's first closing argument, the prosecutor discussed how Ms. Cobb "knew she made a mistake and she took responsibility. She told you how she pled guilty in this courtroom to her participation in the aggravated robbery." The prosecutor also stated that Ms. Cobb "took responsibility for her part in that aggravated robbery and that's exactly what the Defendant should do[,] take responsibility."

Prior to the disputed comment, the State had discussed the testimony of Ms. Patterson, Officer Bowens, Ms. Hunter, C.M., and Ms. Cobb. In discussing Ms. Cobb's testimony, the State outlined her involvement in the offense and noted that she admitted to her involvement when she pled guilty. The State also emphasized that Ms. Cobb's testimony at her guilty plea submission hearing was the same as her trial testimony. Because the State's comment was in the context of arguing to the jury that Ms. Cobb was a credible witness, we conclude that it was not the manifest intent of the State to comment on the Defendant's right to not testify.

However, when considered in the context of the State's closing argument up to the point of the Defendant's objection, a juror would have necessarily taken the comment to mean that Ms. Cobb took responsibility by pleading guilty and by testifying at trial, and that the Defendant should take responsibility like Ms. Cobb did. While this is an indirect comment, the comment clearly creates an inference that the Defendant should have taken responsibility for his actions by testifying at trial. We conclude that this comment was an improper reference to the Defendant's right to not testify.

We must next consider whether the State has established that this non-structural constitutional error was harmless beyond a reasonable doubt. *See Jackson*, 444 S.W.3d at 590-91 (applying the constitutional harmless error doctrine from *Chapman v. California*, 386 U.S. 18, 24 (1967), to improper prosecutorial comments on the Defendant's right to remain silent). When assessing whether the State has met this burden, courts should consider "the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." *Id.*

As the State notes in its brief, after the Defendant objected to the comment, the trial court ruled that the comment did not refer to the Defendant's failure to testify at trial, but the trial court offered to issue a curative instruction to the jury. It is unclear from the transcript how the Defendant responded to the trial court's offer,[2] but the trial court did not issue any curative instruction. Additionally, the prosecutor only commented that the Defendant should "take responsibility" once during closing arguments, so the improper commentary was not "extensive." Further, the nature of the commentary shows that the reference to the Defendant's right to not testify was indirect. Lastly, we agree with the State that the evidence against the Defendant was substantial. The only issue at trial was whether the Defendant was armed with a weapon when he robbed Ms. Patterson; during closing arguments, defense counsel argued that the Defendant was guilty of simple robbery, not aggravated robbery. Ms. Patterson testified that the Defendant had a weapon in his hand while he attacked and robbed her and that she was cut on her hand and head during the offense. C.M. stated that she was close enough to the altercation to see "something in [the man's] hand that he was hitting [Ms. Patterson] with that was causing her to bleed." With two witnesses testifying to the presence of a weapon, the evidence against the Defendant was strong. Based on these considerations, we conclude that the State established that the improper comment was harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this ground.

---

[2] The transcript states that the response from defense counsel was "indiscernible."

### *Comments on Defense "Trickery"*

The Defendant contends that the State, in its closing arguments, introduced a theme that the Defendant was attempting to "trick" the jurors, and he asserts that these statements "denigrate the integrity of the defense by insinuating that counsel would knowingly argue something untruthful to the jury." The Defendant argues that the State's "trickery" theme was calculated to inflame the passions or prejudices of the jury. *See State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

The Defendant asserts that the following statements during the State's closing arguments involved the trickery theme, numbered in the order that they occurred:

(1) Now Ladies and Gentlemen, I don't want you to be confused by the Defendant's appearance during the trial because it's not real. It's a front. It's a fake. He's trying to fool you. This is not the real [Defendant] that was in front of Check [I]nto Cash on April 11, 2013. This is not the same man who attacked Ashley Patterson, pointed a box cutter in her face, cut her, pushed her down. Don't be fooled.

(2) The Defense wants you to be fooled, but don't be. The State has proven every element of aggravated robbery beyond a reasonable doubt.

(3) Next, Ladies and Gentlemen, trying to pretend you got the wrong person.

(4) Last trick from the Defendant, Ladies and Gentlemen, well, it was me. I did rob her. I did run off with the $3,000, but I didn't have [a] weapon.

(5) But he wants you to be fooled into thinking that he didn't have a weapon because she said knife rather than box cutter.

(6) They want you to make something up that you didn't hear when the evidence clearly shows that she was cut with a weapon. It's smoke screens. They want you to be fooled and be confused, but the evidence was clear beyond a reasonable doubt. He is guilty of aggravated robbery. It's obvious.

The Defendant objected after the State's third comment above, and the following exchange occurred:

STATE: Next, Ladies and Gentlemen, trying to pretend you got the wrong person. You heard the witnesses, Ms. Hunter[,] on the stand. You heard Ms. Patterson on the stand. What did the Defendant have on his face during that hearing in General Sessions? A pair of glasses.

DEFENDANT: Your Honor, may we approach?

TRIAL COURT: Yes, sir.

DEFENDANT: There is absolutely no evidence to say that he was presenting anything during the preliminary hearing.

TRIAL COURT: All right. Now, there was testimony from the victim that she didn't recognize him because he was wearing glasses.

DEFENDANT: Which is why that was improper –

TRIAL COURT: There was also testimony that he doesn't usually wear glasses from the girl. So she has a right to draw a reasonable inference that he wore glasses and shaved off his goatee to fool the victim. She has a right to argue that. Now that's circumstantial evidence, but . . . I find it was raised in the proof.

The Defendant attempted to object after the State's comment of "Last trick from the Defendant, Ladies and Gentlemen, well, it was me. I did rob her. I did run off with the $3,000, but I didn't have [a] weapon[,]" but the trial court did not entertain the objection.[3] While the Defendant did not object after the remaining statements, we will consider the Defendant's initial objection to be a continuous objection to the State's "theme" that the Defendant was attempting to trick the jury.

Here, rather than referring to defense counsel or trial strategy, the prosecutor's comments refer to the Defendant's actions of giving the police a false name, birth date, and social security number when he was arrested and the Defendant's action of shaving his facial hair and wearing glasses at the preliminary hearing. The State's comment of "[t]hey want you to make something up that you didn't hear when the evidence clearly shows that she was cut with a weapon[]" and "[t]hey want you to be fooled and be confused, but the evidence was clear beyond a reasonable doubt[]" could be taken to refer to the Defendant and his trial counsel based on the use of "they." However, it is within the purview of the State to argue during closing arguments that it has met its evidentiary

---

[3] Defense counsel asked "May we approach again, Your Honor?" The trial court stated "No, sir."

burden, and we conclude that these statements comment on the State's burden of proof rather than the Defendant's trial counsel or trial strategy. Thus, the State's comments on how the Defendant was attempting to "fool" or "trick" the jury were not improper. The Defendant is not entitled to relief on this ground.

## Plain Error Analysis

The Defendant argues that the prosecutor improperly vouched for the truthfulness of the State's witnesses during closing arguments when the prosecutor commented:

> Now Ladies and Gentlemen, I submit to you that [C.M.] and Ms. Hunter were telling you the truth about what they witnessed on that morning of April 11, 2013.

> [T]he evidence was clear beyond a reasonable doubt. [The Defendant] is guilty of aggravated robbery. It's obvious.

Additionally, the Defendant argues that the prosecutor "vouch[ed] for [the Defendant]'s guilt" when she stated that Ms. Cobb had taken responsibility for her participation in the offense and "that's exactly what the Defendant should do[,] take responsibility[]" and when it stated that the Defendant was "trying to get off for a crime that he knows he committed."

Finally, the Defendant argues that the following portion of the State's closing argument was intended to inflame the passions or prejudices of the jury:

> How many times does Ms. Patterson have to relive this traumatic event before she gets justice? How many times? And how many times must Ms. Patterson point to this man and identify this Defendant as the man who attacked her with a deadly weapon, with a box cutter in her face. Cutting her. Pushing her down. Taking that money from her possession. How many times before somebody will listen to her.

We note that the Defendant did not object to the prosecutor's comments referenced above.[4] The State argues that because the Defendant failed to object to the prosecutor's statements during trial, any error is waived absent plain error.

---

[4] The Defendant objected after the State's comment that the Defendant should "take responsibility;" however, the Defendant objected that the comment improperly referred to his right to not testify and did not object on the grounds that the comment improperly vouched for his guilt.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." The failure to make a contemporaneous objection constitutes waiver of an issue on appeal. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). However, "[w]hen necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

### (1) The record must clearly establish what occurred in the trial court

The record in this case contains a transcript of the testimony at trial, the State's and the Defendant's closing arguments, each party's objections to those arguments, and the exhibits admitted into evidence. For the purposes of our analysis, the record clearly shows what occurred at trial.

### (2) A clear and unequivocal rule of law must have been breached

As noted previously in this opinion, "expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt[]" and "making statements calculated to inflame the passions or prejudices of the jury[]" are possible areas of improper prosecutorial arguments. *Goltz*, 111 S.W.3d at 6. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

The Defendant argues that the prosecutor vouched for the credibility of Ms. Hunter and C.M. when the prosecutor stated, "I submit to you that [C.M.] and Ms. Hunter were telling you the truth about what they witnessed on that morning of April 11, 2013." Immediately after this statement, the prosecutor stated the following: "And I submit to you that their testimony corroborates what Ms. Patterson told you and what Ms. Tiera Cobb told you. And none of these ladies knew each other at the time of the event. None of them." When the prosecutor's comment is viewed in light of the surrounding argument, it is clear that the State was arguing to the jury that its witnesses were credible and that it was not "vouching" for Ms. Hunter, C.M., or Ms. Cobb based on the prosecutor's personal knowledge of the witnesses. Additionally, the prosecutor's comment regarding the witnesses' credibility was tied to the evidence in the case; the State argued that the witnesses were credible because each person's statement corroborated the statements of the other witnesses, yet the witnesses did not know each other before the offense, with the exception of Ms. Hunter and C.M.. When viewed in context, we conclude that this statement was not improper vouching. We also conclude that the prosecutor's comment that "the evidence was clear beyond a reasonable doubt. [The Defendant] is guilty of aggravated robbery. It's obvious[]" was not improper vouching. The comment relates to the prosecutor's argument to the jury that the State had satisfied its burden of proof.

Additionally, the Defendant argues that the State vouched for the guilt of the Defendant when it argued that Ms. Cobb had taken responsibility for her participation in the offense and "that's exactly what the Defendant should do[,] take responsibility[,]" and when it stated that the Defendant was "trying to get off for a crime that he knows he committed." The first comment, that the Defendant should "take responsibility" was stated after the prosecutor summarized Ms. Cobb's testimony. The second comment, that the Defendant knew he had committed a crime, was stated four times in one portion of the prosecutor's argument. However, with both of these alleged errors, the prosecutor did not imply that she had any special knowledge of the Defendant's guilt based on her position as the prosecuting authority. We conclude that these comments were part of the State's argument regarding the Defendant's intent to commit the crime and were not improper vouching.

The Defendant also argues that the prosecutor made a comment that was "calculated to inflame the passions or prejudices of the jury" when the prosecutor asked, in part, "How many times does Ms. Patterson have to relive this traumatic event before she gets justice?" When the contested statement is viewed in the context of the State's closing argument, however, there is no evidence that the statement was "calculated" to inflame the passions of the jury. The prosecutor made the comment after summarizing Ms. Patterson's testimony at trial, and after the comment, the prosecutor argued that Ms.

- 15 -

Patterson's photographic identification and her identification of the Defendant at trial were credible and that her credibility was not reduced by her inability to identify the Defendant at the preliminary hearing. The State's comment refers to the number of times Ms. Patterson had previously attempted to identify the Defendant; while the statement is certainly argumentative, it does not rise to the level of being a calculated attempt to inflame the passions or prejudices of the jury.

We conclude that the State's comments during closing argument addressed in this section did not breach a clear and unequivocal rule of law. As the Defendant cannot establish this *Adkisson* factor, we decline to address the remaining factors. *See Smith*, 24 S.W.3d at 283. The Defendant is not entitled to plain error relief.

*Sufficiency of the Evidence*

The Defendant additionally argues that there was insufficient evidence admitted at trial to establish beyond a reasonable doubt that the Defendant employed a deadly weapon during the commission of the robbery.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

A defendant commits aggravated robbery when the robbery is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1) (2013). Robbery is defined as "the intentional or knowing theft of property from the

person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2013).

When viewed in the light most favorable to the State, the evidence in the record shows that the victim, Ms. Patterson, testified that when she returned to the Check Into Cash store from withdrawing the store's daily operating funds, she "stepped out of [her] truck and locked [her] truck, walked to the back of [her] truck and [the Defendant] popped out from the truck that was beside [her] and pointed the box blade in [her] face and said [']give me the money.[']" Ms. Patterson stated that she was cut on her finger and on her head during the robbery. Ms. Patterson admitted that she initially told the police that the Defendant cut her with a knife rather than a box cutter, but she maintained that she consistently told the police that the Defendant was armed with a weapon during the offense.

C.M. stated that she was close enough to the altercation to see "something in [the man's] hand that he was hitting her with that was causing her to bleed." C.M. was unsure of exactly what type of weapon the man was using, but she saw that "he had some type of weapon in his hand under his jacket sleeve." While the Defendant argued during his closing argument that he was not armed during the offense and therefore guilty of only simple robbery, it was within the province of the jury to accredit the testimony of Ms. Patterson and C.M. and to find the Defendant guilty of aggravated robbery. There is sufficient evidence in the record for a rational juror to have found the Defendant guilty of aggravated robbery beyond a reasonable doubt. The Defendant is not entitled to relief on this ground.

### III. Conclusion

After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY JR., JUDGE